I please the court. I am James Sweats. I represent Brandon Piekarsky. I would like to reserve two minutes for rebuttal. There are a number of issues. I have no idea what music that is, two minutes. There are a number of issues that overlap with what Mr. Federoff is going to argue. I am going to concentrate on three. Some other arguments were raised in the brief, and I'm certainly not waiving those. The three I want to concentrate on are the sufficiency of evidence, the denial of a defense, and the sentencing issue, voluntary and involuntary manslaughter. To understand the sufficiency and denial of a defense argument, we must start with the statute here, which is 3631. 3631 is not a generalized hate crime law, nor is it a federalized assault law. It is very narrow and contains two because elements. Those because elements are because of an animus, racial, national origin, religion, et cetera, and because of the victim's occupancy of a dwelling. We're familiar with that. We are, but isn't the evidence here, and the argument you're making is certainly, or are going to make based upon this, certainly a good argument, but isn't that a jury question? I mean, there's enough that the jury heard in terms of what the motivation of the attackers of the defendants here was for the jury to conclude that there was a motivation here to not just injure Ramirez, but to basically coerce Ramirez and any other person of similar perceived national origin not to come into Shenandoah. Couldn't a jury, a reasonable jury, conclude that? On the basis of the evidence produced by the government in this case, the answer is no, and I will explain why. I refer the Court to United States v. Nelson, which is a Second Circuit case cited by Pekarsky as well as by the government for a different issue than I'm going to argue right now, but that case arose in the late 90s when there was a conflict between the black community and the Jewish community in New York. An individual, a Jewish man, was attacked. Give me the case again. Yes, United States v. Nelson. Okay. Second Circuit, 277 Federal 3rd 164. That was a case under 18 U.S. 245, which is a public facilities statute, but it has the same two becauses that I just identified, because of the racial animus, because of the use of a public facility. The argument in that case, among many, was that the evidence was insufficient because there was no evidence, direct evidence, that there was any. The nexus wasn't there. The nexus. Exactly. The nexus with the use of the public sidewalk, which was deemed to be a facility. That there was obviously an animus toward this person of whether, as the government characterizes it, Jewish race or Jewish religion, but the use of the public sidewalk, there was no direct evidence, so how do we get to the jury on that? The Second Circuit said there was enough evidence simply because the assault occurred during the protected activity, the use of the sidewalk. And what is interesting in our case is not only wasn't there any evidence that these boys knew Ramirez lived in the borough of Shenandoah, which the government concedes. But is knowledge necessary? Go back to Mexico. That's what I'm arguing, because there was no direct evidence. But the statute, by my reading of the statute, doesn't suggest that they had to know that he was a resident of Shenandoah. When you look at the phrase, because of occupancy of a dwelling, and recognize which the government will concede, these boys did not know Ramirez, so it follows they did not know Ramirez lived in the borough. But they did say something like, get out of Shenandoah and tell your Mexican friends that we don't want you around, so what are words to that effect? There's no question. 3631B says, or to intimidate such person or any other person or any class of persons from occupying a dwelling. So even if they didn't know he did occupy a dwelling, isn't there sufficient evidence under 3631B for the government to have made the case that there was an attempt here to intimidate Mr. Ramirez and any other person or class of persons by saying things like, get out of Shenandoah, go the F back to Mexico, et cetera, et cetera. I mean, there's a whole series of comments like that, right? There were a series of comments like that, but the indictment, as well as Judge Caputo's charge, told the jury that they had to find that this assault was because of Ramirez' occupancy of a dwelling. That's the distinction. The interesting thing about the government's indictment in this particular case is that they used the two becauses that are in the statute, but they added the third one, which Your Honor just identified. Was there more to the instruction, though, by the judge with regard to occupancy? I mean, he didn't limit it just to that, did he? The judge said because of occupancy and other Hispanics living in the borough, something to that effect. But the interesting thing is that last aspect, directed toward others, is in the indictment with the two becauses. And I'm suggesting to the court- How about directed to others? I mean, don't you take that in the broadest sense, meaning others who may live in Shenandoah? But they still had to prove that it was directed at Ramirez' occupancy of a dwelling, which is what the government did not prove in this particular case.  Of a dwelling. So if we accept- I'm sorry. No, go ahead. If we accept what you're saying, that they had to prove that, is it fairly inferable from the evidence, if they're saying things like, get out of here, go back to Mexico, if you other people don't get out of here too, you'll be like him, that a reasonable jury could look at that and say they understood Ramirez was an occupant. They may not have known his address, but they knew he was somehow a resident in Shenandoah, and they were attacking him, at least in part, because of that. Let's suppose, hypothetically, that Ramirez was simply a transient in that park. That would not be because of his occupancy of a dwelling. The federal statute's limited. We characterize it, Your Honor, with all due respect. We characterize it as the federal government's attempt to put a square peg in a round hole. Sir, I understand your argument is that they're trying to turn this into a generalized hate crimes statute, but stick with me here for just a minute. If the facts and circumstances are they confront Mr. Ramirez or he confronts them, I understand there's some disagreement about that, in the park while he's with the young woman who they know, and I guess my question to you is this isn't some hypothetical where they think maybe he's a transient or something like that. They are, could a reasonable jury, given these facts, say they understood him to be in the community, participating in the community, in fact, with this person and socializing with this person in the community. This wasn't a vagrant moving through. This was somebody in the community, and that explains, in part, their comments about get out, go there, back to Mexico, this is our town, et cetera. That's why I refer the court to the Second Circuit case that I just mentioned, where the court talked about what is sufficient to get to a jury under that because. And in that particular case, the court said that we reached the conclusion in this case, the only evidence of activities-based intent, the activities-based intent in our case is the occupancy of a dwelling. In the Nelson case, it was the presence on the sidewalk. And what the court said was that's where it happened. And the Second Circuit cites from other circuits on page 198 of the opinion, talking about where the attack occurred in a federal swimming area, et cetera, et cetera, et cetera. Let's keep in mind 3631 originated as the cross-burning statute. And all of the cases, whether it's the Gilbert case that was cited, and there was also the Gresser case, were cases where the individual who did the intimidation was doing it either at his neighbor's home, or at the home of another, or at the adoption agency, which was placing minority children in the homes within the community. There was, as Judge McKee said, a nexus. That's what didn't exist here. That's why we raised the knowledge argument, because you can infer an intent from knowledge. But the government didn't prove that. And so if you follow Nelson, Nelson means Judge Caputo should have granted our motion for judgment of acquittal, because there was no nexus. But Nelson was simply a statement that the nexus existed there. It didn't say that being on the sidewalk or being in a home was the sine qua non of finding the nexus under the statute. It simply said that here we have it. It didn't say that you have to have that kind of presence to have it. They didn't say that's the only way you could have it, presence, because there were other ways to have it. They recite cases in Nelson where individuals stated directly that they were going to, let's get them out of the park. Let's get them out of the street. Let's get them out of town. Well, I think it's different, though, because being in town doesn't mean you're occupying a dwelling. And I agree that this statute, just like I characterized the government's attempt at putting a square peg in a round hole, we have to take what Congress has given us. Most assaults are prosecuted on the state level, as it was here. And like the verdict or not like the verdict, Brandon Pekarsky was acquitted of murder and ethnic intimidation. The government, the federal government was involved in that prosecution from the beginning. They didn't like the verdict. Yeah, but they didn't control the prosecution at the state level, did they? I mean, it's a matter, again, Your Honor, we interpret that differently. They interviewed witnesses. The FBI participated with the Schuylkill County District Attorney's Office. But co-participation is very different than controlling. You're getting into the double jeopardy argument. And I recognize the problems with that. In fact, there's a footnote in Nelson where it said, you know, dual sovereignty should be revisited. But unfortunately, as the Second Circuit Court of Appeals, we can't do that. And I appreciate you're in a similar position. We've got some precedent that says something along the same lines. But it is what it is. We've got a binding Supreme Court precedent that tells us that can happen. Briefly, if I can just address the other issues, I realize I'm out of time. Well, you may have noticed that we appear to be colorblind in terms of the timing on that light. But there are some time issues on us now. I recognize that. The denial of defense. The indictment was narrower than the statute. And you can get into arguments of race, ethnicity. Nobody seems to understand that. We raised somewhat tongue-in-cheek with the trial judge. The issue, well, the federal government is saying that being Hispanic is ethnic. It's not race. Look at the census form. But when you go and look at the statute, there's one thing that is important. It does not prohibit. And, again, this is what Congress did. It does not prohibit alienage discrimination. Well, it talks about national origin. But case law indicates national origin is where you're from. Right. Alienage is whether or not you're a citizen. In fact, as the Anderson case. But if you're arguing, maybe my colleagues can hear me. But if you're arguing 3631 only applies if you have a legal right to be here, I understand your argument. But that's, I mean, looking at the language, and you might have some better arguments than that. You might want to spend a minute or two on that. I just can't see how you can get that congressional intent out of the text of 3631. Well, maybe I should move on to the sentencing argument. Well, yeah. Maybe you should. Even more to the point, even if they, there's plenty of evidence in this record, isn't there, that would, from which a rational jerk could say legal, illegal, there was animus toward Hispanics, period. My race, ethnicity. There's no question, Your Honor, the strongest argument, which is strange because sufficiency is rarely strong. But the strongest argument in this case is the nexus and the narrowness of the statute, using by analogy the Nelson decision. So sentencing. Sentencing. In the federal system, you don't deal with manslaughter that much. In the state system, you do. And when you look at a litany of cases, generally speaking, voluntary manslaughter is an intentional killing. Involuntary manslaughter is a killing that is negligent. But I'm not sure that helps you because that moves into third degree murder in Pennsylvania, which I know what the state verdict was. But it seems to me if any guideline was appropriate here, it would be, if there was such a thing, a murder guideline. I totally understand what you're saying about voluntary versus involuntary. But this just doesn't strike me. And for three years I did nothing but homicide trials. This just does not strike me as voluntary manslaughter. I understand what you're saying about the guideline. Neither the government nor the defense agreed with that. We agreed that it was a manslaughter. The issue was whether it was voluntary or involuntary. And one thing I want to emphasize here, again, undisputed in the record. You can talk about three fights, one fight, it doesn't matter. But there's one fact that was undisputed. And that fact after Ariel Garcia and her husband Victor Garcia, and getting back to the animus, let's not forget Colin Walsh said to Victor Garcia, we don't have a problem with you. Well, I think actually what he said, wasn't it, is that this isn't racial? Even as they were yelling, get out of here, you effing Mexican. That's true. That's true. But there wasn't a generalized animus. But the most important thing here is the fight was over. Ramirez got up. He was with Victor Garcia. The boys were walking away. Ramirez ran down, struck Scully. In a matter of seconds, Colin Walsh then punched Ramirez. He fell. His head hit the pavement. It was undisputed that Ramirez started groaning, that he never again got up. And then there was a kick. And the issue of who kicked was a disputed issue in the trial. The jury was not asked to designate who kicked. We maintained from the beginning that it wasn't Brandon Pekorski. But there were multiple kicks, right? I mean, that's, if this, this is a tragic tragedy. No question, Your Honor. All the way around. Young boys doing foolish things and it devolves to terrible circumstance with alcohol. I mean, no, I don't think anybody at any level of the court system, you know, is thinking about these defendants that they're heinous criminals. These are young men who put themselves in a position through alcohol and some pretty kind of a hateful mindset to do a terrible thing. But when you're looking at, if it had just ended with a punch, there might have been some problem. But not this. What happens after that punch is a group surrounds him, kicks him furiously, stomps on him. With all due respect, Your Honor. No, that's not true. Where the final punch, after everybody's walking away, Ramirez gets up. He's with Victor Garcia. He says in Spanish the equivalent of he's an M.F. And then runs down the scully. Understand. When he falls, there was only one kick. The issue of who kicked was a matter of dispute at the trial. We presented the testimony of a woman who knew Ariel Garcia. That was Chief Ashman of an adjoining police department. Ariel Garcia said it was scully. But there was only one kick. How many punches were there? I'm sorry, Your Honor. How many punches to the head were there? At that point, none. There was one to the head, he falls, and then a kick. This was after the fight was over. This was scully ran, undisputed, 127 feet down. That's why we said, because it happened in a matter of seconds, Ramirez was fine. He was bruised, but he was fine. He got up. That's why we characterize it as manslaughter. He was stomped on, right? I mean, he had a footprint visible on his chest. There were three discrete, we call them three discrete fights. The first one, Pekarsky is in the fight with Ramirez. Then Pekarsky was getting the worst of the fight. Pekarsky gets up, falls, Donchack hops in. There's one witness, I think her name was Eileen Slack, talked about during that, what we characterized as the first fight, the stomping and the kicking. And Mr. Donchack is wielding some sort of a weapon at that point. He's got a metal object in his hand to give that extra force. There was testimony to that effect, yes. But the actual, if what I'm basically saying, and again this borders on jury argument, I appreciate that. But if Ramirez had not run the 127 feet down the street, he'd be alive and we would not be here today. Well, had they not started throwing racial and, however you call it, racial, ethnic, cultural, national origin epithets at him, everybody would be. Ramirez would be alive. No question, Your Honor. But again, getting back to the statute that we're here on. But that doesn't give you manslaughter. And I don't justify that. I just don't see how that, and it's almost an ephemeral argument we're having because of the nature of trying to graft what is basically a common law state offense into a federal guideline system. That's correct. It creates problems. But again, to try to analogize this to voluntary manslaughter, where there seems to be along the way, you said three fights, opportunity for cooling or opportunity to remove yourself from, even after Ramirez takes the fight to, I guess, Scully. This is clearly not the kind of situation where you have an overwhelming emotion that is so overwhelming and socially understandable that the society allows it to negate the element of malice, take away murder, and give you to manslaughter. Except imperfect self-defense and imperfect defense of others does point you into manslaughter, typically voluntary manslaughter. I thought you were talking about heat of passion. That's an alternative to heat of passion. Imperfect self-defense, if your force is unreasonable or you unreasonably believe that you have to protect yourself in the area of self-defense, and you act, and that negates murder to voluntary manslaughter. So that's voluntary. Voluntary, no question. Okay. But the cases we have identified where many common law cases, I concede that, but also we mentioned two federal cases, where you're talking about kicks alone or in fists alone, they tend to be involuntary manslaughter. In the case cited by the government. Well, when you take a fist and you amplify the force or magnify the force, again, you're talking about something else. But even what you're saying, it's still voluntary manslaughter. You're arguing that the appropriate guideline analogy here is involuntary. That is correct, Your Honor. Negligence. Recklessness. There are two alternatives. One is negligence. One is reckless. Well, to me, I don't know how you get reckless out of that kind of deliberate conduct. I don't know how that can be perceived as reckless. I mean, arguing, I don't know what that metal packet is. Well, that had nothing. It seems like a brass knuckle. But that metal pack was not involved. In fact, Donchak wasn't even involved in that last fight. How was he? What was the culpability question to the jury? How was it phrased? The question to the jury, which the government put in its supplemental appendix, it was the jury verdict form simply asked, count one with respect to the charge of count one of the indictment. Will the jury find defendant Derek Donchak guilty, not guilty? Guilty. With Pekarsky, it was the same. And the only question was the issue of the death with regard to count one of the indictment. Will the jury find the death of Louis Ramirez was or was not proximately, naturally, and foreseeably caused by the acts that violated 3631, which the judge covered in his instructions? But the judge, you see, the government, even though we argued that Pekarsky was not the one who kicked Ramirez at the end, and that Pekarsky was out of the picture at that point, even though Scully and Walsh, who were the government's witnesses, Scully was the one who started the entire incident. Doesn't the jury's verdict essentially say that the in-believer version of the events? Yes, but getting back to what I argued at the beginning, it shouldn't have gone that far, because the judge should have granted the motion for judgment of acquittal based upon the failure of the nexus. Thank you. Thank you. Mr. Federhoff, is that correct? Good afternoon, Your Honors. My name is William Federhoff, and I represent Derek Donchack. I have indicated that I would like to reserve, if I need it, two minutes for rebuttal. I'm only going to address, since Mr. Sweats has addressed much of the rest of the case, two issues, and that is the instruction of the court, which was under 42 U.S.C. 3631, and number two, the sufficiency of the evidence on the two obstruction counts under 18 U.S.C. 1519. Those obstruction counts were only against Mr. Donchack. If the jury were, going to your second argument first, If the jury, well, you're saying there's not enough evidence to believe that there was one conspiracy. Are you saying that the evidence supported, the jury could look at this and find one obstruction conspiracy, or they could look at it and see the kids and the parents doing one thing to obstruct justice, the police doing another thing to obstruct justice. But you're saying that under our deferential standard, the evidence is not sufficient to allow for the former to happen, given the chain of phone calls and everything else that occurred. He wasn't keeping in mind the charge was not obstruction generally. The charge under 1519 is that Mr. Donchack, in conspiracy with the police officers in count two, or in count three as an aider and a better to the police officers, made false entries in police reports with the intent to obstruct the federal investigation. The charge was broader than that. Whoever knowingly covers up, falsifies. Well, the covers up, it was count four that was withdrawn. Okay. Counts two and three concerned the false police reports that were allegedly made by three police officers in the Shenandoah Township Police Department. And your pitch is that there were really, if at most, there were two separate conspiracies, right? Absolutely. The boys and the police. Yeah. How do you square that with the evidence that the police officers, I shouldn't say all of them, there was evidence that Officer Moyer and Officer Hayes at different times met with the boys, some of them together, sometimes one-on-one, that there were comments. Get your story straight, get rid of your... The evidence, and I addressed that, that's why I addressed that with some care. The only direct evidence against any of the police officers was against Officer Moyer, who on two occasions, first he approached the parents of, I think, Brian Scully, and later approached Colin Walsh. And he said to Colin Walsh, this was months after the event, he said, you know, keep your story straight. Brian Scully... that on the night of the incident, one of the officers says, let me have a moment alone with... No, there is evidence that both Mr. Donchack was in the police car with at least one of these officers, if not two, and another citizen who had been a witness of some sort. There was no testimony about what was said in the car. There was also evidence that Brandon Pekarsky was in the car with Officer Hayes. Right. But nothing, there was no testimony about why that was. That's not unnatural, given Pekarsky was a suspect at the time. When you say there's no, I mean... You say no direct evidence. We don't look at, like, one thing in isolation. If Officer Hayes says to young Mr. Moyer, get out of the car, I want to talk to Brandon alone, or words to that effect, and they have a conversation and are seen to shake hands... He said, Boyer, you can go. Pekarsky was in there. It is true that this is exactly what the government's effort was. Right. They're saying, here they are together, and you can fairly infer that from the outset, now, you know, the evidence is... Infer from what? Infer from the evidence the government puts forward that Officer Hayes has a personal relationship with Brandon Pekarsky's mother. So you put that all together, and it comes to the conclusion that they must have conspired together to obstruct justice. No, not that they must have conspired, but that it is direct evidence from which a jury could infer at the very outset there is a connection between what the officers are doing and what the boys are doing. I mean, I know that you had a different view of it, but we've got to look at it. No, it's not a question of my view. This is not like the sufficiency on the first, on the general issue. This is a sufficiency that is very pointed to exactly the fact that although, this is a very small town, that although there were associations between Officer Hayes and Brandon Pekarsky's mother, although Brandon Pekarsky's mother knew Chief Nestor, although Officer Moyer's son played football at the same high school, there's all these associations. And there were phone calls. But there are specific things. There's like, what, like a dozen or more phone calls that night between Officer Hayes and Mr. Pekarsky. But I think what is in your argument on that, because you're right, you address this very precisely in your brief, and I'm really curious to hear what Ms. Miller has to say in response to it. I'm sorry. No, I'm saying that you're right. You address this very, very precisely, and I'm not minimizing your argument, but your brief is incredibly forceful and lucid, and I'd kind of like to get Ms. Miller's response to your argument. We understand what you're arguing. Okay. I'll let the sufficiency on that go then, if you're satisfied. The jury instruction on 3631, likewise, over-objection. The court did, and I quoted this on page 23, and the entire charge of the court is in the record, gave a so-called mixed motive charge, and that was that the – Aren't the cases really clear on that? It doesn't have to be the exclusive motivation. There's two categories of cases. The Fifth, Seventh, and Tenth Circuits, as I acknowledged in my brief, have resolved this issue against us. This circuit, in two cases, has addressed the same issue under 18 U.S.C. 241 and 242. This circuit, to my knowledge, has not addressed the issue under 3631. I think what's important to keep in mind today, especially in reference to the Fifth, Seventh, and Tenth Circuit, who have addressed this directly, is that Bailey v. United States was, as I cited, decided in 1995, after almost every circuit in the country had held that, under the firearm statute, using and carrying a firearm in connection with a drug trafficking offense or a crime of violence really didn't mean using or carrying. It almost came very close to mere possession being adequate. The Supreme Court in 1995 turned around and said no. Using and carrying means using and carrying. It has to be shown that there was some active employment of the firearm in the commission of the specified offenses. That's what we're relying on, the same logic. This statute does not say mixed motives. This statute, Congress could easily have said, if these crimes are committed for the reason motivated by race in any part. Well, why do they have to say, why isn't it just as logical a reading of the statute to hear, if they say because of race and because of having a dwelling, means exactly that? It doesn't mean to the exclusion of all other motives. It just means that what happens has to be because of those things at least. Because you begin to dilute the statute, which is very clear on its face, and because Congress could have said, among other reasons, if race and the desire to exclude an individual or a group from housing is at all a part of the case, if that is proven in any degree. The statute didn't say that. Congress did not say that. And Congress could have said that. We do understand your argument. You've used it for some time, I think. That's all. Thank you very much. Ms. Miller? Thank you. If you could address, at least in my mind, the nexus issue that was first argued in Mr. Sweat's. Absolutely. May it please the Court. Angela Miller. You're talking about in 3631, both because of race and because of some housing activity. 3631 has two parts that are applicable here, Part A and Part B. And the best way to think about it is Part A prohibits somebody from acting because of somebody's race and because they are engaging in an activity, selling, buying, leasing, renting, or occupying. Part B is somebody acting because of their race to intimidate someone from engaging in any of the activities set forth in B, buying, selling, renting, leasing, or occupying. So you can violate the statute by, because of someone's race, intimidating them so that they won't live in your neighborhood. So you don't have to prove that there was knowledge that the victim was an occupant in some apartment in Shenandoah. Absolutely not. The jury, excuse me, the indictment alleged a violation of 3631. We didn't say A or B, and we set forth in the language, language that would cover Parts A and Parts B. Well, that means any transient in the town, as long as that, the statements or the intimidation or the threats are on account of race, national origin, et cetera, can be directed at any transient. And if I don't want you and others like you living in my town, and so I'm doing something to injure or intimidate. What about the charge? Was the jury charge specific to subsection A or B? Absolutely, they were. So the jury was instructed that one of the ways that the government could meet its burden of showing that this was on the basis of race and the basis of engaging in a housing activity was the government may prove the third element of the statute I just mentioned, Section 3631, by establishing that Mr. Pekarsky and or Mr. Donchek did not want the victim or other Latino persons to live or occupy any dwelling within Shenandoah. And the reason behind this – Would that include undocumented aliens? Absolutely. The statute says any person. It's clear. There's a part of the statute that refers to citizen. That's Part C, and that's when you're advocating, I think, on somebody's behalf. So if Congress wanted to limit it in any way, they certainly could, and they did. But in Parts A and Part B, it refers to any person. Sure. Is your position that it wouldn't matter whether Mr. Ramirez was occupying a dwelling in Shenandoah? He could have been just a vagrant in the park, but the fact that they said go back to Mexico, that's enough to say this is because of a dwelling. I think you can look at this is Shenandoah, get out of here, go back to Mexico. I think more important, the better evidence is tell your friends, tell your Mexican friends to get out of Shenandoah or you're going to be lying right next to Mr. Ramirez, who was lying on the ground dying from a head injury. That turns it into a general hate crime statute. Oh, absolutely not. You have to show that there's a connection between their right to be in a community and try to secure housing free from discrimination based on race, color, religion, national origin. You've just taken it, haven't you, away from housing for just mere presence? I mean, doesn't 3631 require something to do with housing? The way you've articulated it, Ms. Miller, it sounds like what you're saying is you can never say anything like I don't want you around without having that somehow connected with housing and dwellings, et cetera, et cetera. Is that really that broad a statute? No, and if that's how it was interpreted, I certainly didn't intend it to be. We have the language here in this case, go back to Mexico and tell you and your Mexican friends to get out of Shenandoah. They knew there were Hispanics living in the neighborhood. They actually talked about that beforehand. They didn't like the fact that Hispanics were coming into Shenandoah. They asked themselves questions. Why are they here? They called them stick. They called them wetback. They called them Mexican because they thought it was offensive. You look at that and then you hear the language, tell your Mexican friends to get out of Shenandoah or you'll be laying next to him. I think that animates these facts much more than just a simple go away. That's not what we had in this case. So it doesn't have to be read as broadly to cover a transient in the park, right? No, absolutely not. And I don't think you have the facts in this case that refer to transient in the park. You have the facts that I just mentioned that tie this into definitely trying to intimidate Mr. Ramirez or other Latinos from living and remaining in Shenandoah. What about the manslaughter argument? I'm sorry? Well, two things. The manslaughter argument, if you could just very briefly touch that. Well, the more significant one, at least in my mind, is the conspiracy argument. Touch on that first and then the manslaughter argument. Touch on conspiracy? Please, if you would. Sure. First of all, it's reviewed for plain error because there wasn't a motion made at the close of the government's case where all evidence were after trial challenging the sufficiency. So I do want to point that out that it's reviewed for plain error. I think the best evidence you have here of a single conspiracy between the kids and the police is Moyer going to Walsh's house and asking him, did you have a chance to talk to your friends? Do you know what I mean? So I think from that evidence, any reasonable juror could have concluded that there was a conspiracy between the participants in the assault and the police to try to cover up what happened. Then you get to the statements that were made by the individuals who participated, and they're leaving out the key evidence that there was a kick, that they made racial slurs, and they lied that Mr. Ramirez was the aggressor. And you have Lieutenant Moyer, at least, knowing that information is false and not challenging it and letting it get into an official record. We do mention in our brief, I think it's important to note, that the government's position is that the district court's decision that the government has to show knowledge by the defendant of a potential federal investigation is wrong. It's contrary to the Second Circuit's decision in Gray, and it's inconsistent with the Supreme Court's decision in Urimian interpreting a similar language in 18 U.S.C. 1001. The statute was specifically drafted to eliminate the nexus that was required in 1503, the Supreme Court decided in Aguilar. Nonetheless, the jury was instructed they had to find one, and they did find one. And again, it's under plain error review. Would you like me to go to manslaughter? Or do you have any more questions about sufficiency? I'm actually content on manslaughter, unless I am too. I'm sorry? I said I'm actually content on manslaughter. I understand your position. You're content on manslaughter. Mixed motive, I just want to say, every court to have considered the issue of whether 3631 incorporates a mixed motive instruction has held that it does. And so the language is because of race and because of some engagement in a housing activity, not because and only because. If there are no further questions, we'll rest on the merits of our brief, and we ask you to affirm the convictions and the sentences. Thank you very much. Thank you. Mr. Swartz? In answer to Judge Fuentes, did the Congress of the United States, with the use of any person, intend to cover undocumented aliens? The Congress of the United States did not intend to confer a federal right to housing upon people who do not have the right to be in the country. Well, it doesn't confer a federal right to housing. It confers a right to not be accosted based upon perception, at least of national origin, race, in the pursuit of some things, including housing or the other kinds of things mentioned in the statute. But there is, let me also mention there is a federal right to housing because not everybody who is here illegally, you can be here illegally and still have a right to housing. You indicated that in the Lozano opinion. Right. You said if an individual were here in removal proceedings, for example, where would he go if he was out on bail? I cite that in my brief and say at least the government had to show that. Getting to the issue on the nexus, which I think is terribly important, the government said we covered the two statutes in the indictment or the two sections of the statute. Judge Caputo charged the jury as follows, without objection by the government. In order to establish a conviction, the violation of that statute 3631, the United States must prove beyond a reasonable doubt the following elements. Second, or third, that Mr. Pekorsky and or Mr. Donchack acted because of Louis Ramirez's race and because he was occupying a dwelling in Shenandoah, Pennsylvania. That's what the judge charged the jury. Then he went on again and he said the third element of the statute, 3631, requires proof that Mr. Pekorsky and or Mr. Donchack acted because of Mr. Pekorsky's race of other Latino persons occupying dwellings in Shenandoah and because Louis Ramirez or other Latino persons were occupying dwellings in Shenandoah. I submit that the government's argument here is not what the government, without objection, allowed Judge Caputo to correctly instruct the jury, and that is that there must be a nexus. Ramirez had, there must be evidence Ramirez lived in the, in the borough and because there was no direct evidence of intent, you needed knowledge to infer intent. That's why I asked about the charge. But your light is on and we've got to keep a little tighter rein now. And I know Mr. Federoff reserved. I gave you two minutes. Okay. Well, the birth, both of these are really phenomenal. Grease, which is not to say that all the briefs we got today were great, but in this case we had some very well written work. We thank counsel. We'll take the matter under advisement. Thank you.